UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | | |
|---|---|---|
| COURTNEY STEWART, as Administratrix of the Estate of Christopher Hall, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 0: 20-008-DCR |
| V. | ) ) | |
| WILLIAM HENSLEY, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Christopher Hall, a chronic heroin and methamphetamine user, was treated for symptoms of drug withdrawal during his eight-day stay at the Boyd County Detention Center. Unfortunately, Hall also was suffering from infectious endocarditis secondary to intravenous drug use and likely became septic at some point during his incarceration. He eventually was transferred to a hospital where he later died.

The Administratrix of Hall's estate has sued the jail and its healthcare providers alleging claims of negligence, negligent infliction of emotional distress ("NIED"), and deliberate indifference to Hall's serious medical needs. However, to the extent the defendants were aware of Hall's symptoms, they reasonably believed he was withdrawing from controlled substances and responded adequately to his condition. Accordingly, they were not deliberately indifferent to his serious medical needs.

Next, the Court concludes that the Boyd County Defendants are entitled to qualified immunity with respect to the plaintiff's negligence and NIED claims because the challenged

- 1 -

actions were discretionary in nature. The medical defendants are entitled to summary judgment on the medical negligence claims because the plaintiff has not presented evidence that they breached any applicable standards of care or that their conduct was the proximate cause of Hall's death. Finally, the medical defendants are entitled to summary judgment with respect to the plaintiff's NIED claims because the plaintiff failed to present any scientific or medical proof of serious emotional injury.

## I.    Background

Ashland Police arrested Christopher Hall for possession of methamphetamine and drug paraphernalia at approximately 4:20 a.m. on December 30, 2018. Hall was promptly booked into the Boyd County Detention Center ("BCDC"), where jailer William Hensley had recently taken office. A BCDC policy and procedure manual had been created in March 2016, but no deputy jailers had received a copy of it and "it was not being used as a policy manual at the jail" during Hall's incarceration. [Record No. 91, pp. 37-38]

BCDC contracted with Advanced Correctional Healthcare, Inc. ("ACH") to provide healthcare services to its inmates. ACH agreed to provide 16 hours of on-site nursing staff, seven days a week. [*See* Record No. 88-2.] A physician or mid-level practitioner was required to visit the facility at least once a week. Additionally, a physician or mid-level practitioner was required to be available by telephone seven days a week, 24 hours per day. *Id.*

If a BCDC inmate wished to see a nurse for a non-emergency reason, he or she could place a sick-call request. *Id.* at 13. At the time of Hall's incarceration, inmates could do so electronically by using an in-cell kiosk. Inmates also could submit a request by filling out a paper form and submitting it to a deputy if the kiosks were unavailable. The inmate would be placed on the sick-call list and would later be taken to the jail's medical office to see a nurse.

The nurse could contact a higher level practitioner for guidance if the nurse deemed it necessary.

Hall responded to standard medical questions during the booking process indicating that he had high blood pressure, was taking prescription medicine, and had a history of heroin withdrawal. [Record No. 88-7] He was assigned to a holding cell to await an initial medical assessment following booking.

LPN Dawn Voss assessed Hall at 9:24 a.m. on December 30.[1] [Record No. 88-9] Voss noted that Hall had high blood pressure and hepatitis C, swelling and pain in his right thumb and left pinky, and that he had "sores all over." Voss wrote "clonidine" next to the notation about Hall's blood pressure, but also stated that he was not currently under a doctor's care and had no current medications. Voss noted that Hall was an everyday user of heroin and methamphetamine, and had last taken one or both of those substances "yesterday."

Given this information, Voss started a Detox Flow Sheet to monitor Hall for symptoms of drug withdrawal. [Record No. 88-10] Voss recorded Hall's vital signs on the Flow Sheet as follows: blood pressure 140/90; pulse 99; respirations 16; and temperature 99 degrees. Around a half an hour later, Hall was moved to Cell C, an assessment cell, to be monitored for withdrawal symptoms.

LPN Devin Patrick assessed Hall on January 3, 2019, at 12:49 a.m., after Hall placed a sick call complaining of a fever. [Record No. 88-13] Patrick recorded the following vital signs: blood pressure 142/94; pulse 107; respirations 18; temperature 99.9 degrees; and pulse oximetry 97 percent. Patrick called ACH's on-call physician, Dr. Ronald Everson and

---

[1] The plaintiff incorrectly identified this defendant as "David Voss."

described Hall's complaints and condition. Everson ordered Tylenol for Hall and advised him to rest. Later that morning, at 11:40 a.m., Hall was moved to Cell K, a general population cell. [Record No. 88-8]

Patrick saw Hall again at 1:52 a.m. on January 5, when Hall complained that he was still having "fevers daily" and needed something for withdrawals. [Record No. 88-14] Patrick checked Hall's vitals, and recorded them as follows: blood pressure 135/82; pulse 92; respirations 18; temperature 99.0 degrees; and pulse oximetry 98 percent. Patrick again contacted Dr. Everson, who increased the frequency of Tylenol and continued to encourage rest.

LPN Susan Yeargin saw Hall on January 5 at 2:00 p.m., when she responded to Hall's request for blood pressure medication. [Record No. 88-17] His vital signs were as follows: blood pressure 148/84; pulse 88; respirations 16; temperature 97.2; and pulse oximetry 98 percent. Yeargin contacted Dr. Everson and who prescribed Hall 25 mg of Metoprolol two times per day.

A deputy was conducting rounds at around 11:30 p.m. on January 6 and noticed that Hall seemed unwell.[2] The deputy escorted Hall to the medical office where Nurse Patrick assessed him at 11:34 p.m. According to Patrick's progress note, Hall complained, "I'm withdrawing." [Record No. 88-20] His vital signs were: blood pressure 155/92; pulse 98; respirations 18; temperature 99.6; and pulse oximetry 99 percent. Patrick noted that although

---

[2]     The defendants contend this individual was Deputy Joshua Miller, while the plaintiff identifies him as Deputy Jeff Johnson. The employee work schedule submitted by the BCDC Defendants indicates that both deputies were on duty at the time in question. [Record No. 88-1] It does not appear that either of these individuals were deposed, but the parties report that Miller, who is a defendant in this case, has passed away.

Hall's vital signs were relatively normal, he appeared to be "withdrawing hard from admitted heroin use." [Record No. 88-30]  Patrick contacted Dr. Everson who prescribed Vistaril and Bentyl, which are both prescribed to ease withdrawal symptoms. [*See* Record No. 101, p. 29.] Hall was placed on "medical watch for close observation" and was transferred to Cell 164, a medical watch cell near the booking area, at 12:10 a.m. on January 7.

Hall experienced "significant diarrhea" shortly after arriving in Cell 164.  At 1:24 a.m., deputies escorted him to a shower in the booking area while other deputies supervised cleanup of the cell.  Hall exited the shower at 1:48 a.m.  He then sat in a chair in the booking area until 1:55 a.m., when deputies escorted him to Cell 157A.  Deputies entered Cell 157A with a mat and blankets at 3:41 a.m.  Hall sat up and spoke with deputies before standing up, walking to the mat, lying down and covering himself with the blanket.  At 5:29 a.m., Hall woke up, got off the mat and moved around briefly before returning to the mat and lying back down.[3]

Sergeant Travis Hanshaw clocked in a few minutes early for his 6:00 a.m. shift on January 7.  He received a report almost immediately from Sergeant Matthew Coburn or Deputy Joshua Miller (he could not remember which) that Hall was in Cell 157A and "wasn't acting right."  Hanshaw "gave all of the deputies their layout" and got his "beginning shift stuff done" before going to check on Hall.  Hanshaw remembered that not much time passed before he went to check on Hall, but he could not recall whether it was more than an hour.  [Record No. 96, p. 8]  When Hanshaw entered Cell 157A and bent down to talk to Hall, he found it odd that Hall communicated only by shaking his head rather than by answering questions verbally.

---

[3]    The BCDC Defendants have tendered video footage of the following events: Hall walking down the stairs to medical on the night of January 6; Hall walking the hallway to and from the medical office; Hall walking back up the stairs from medical; Hall walking to the shower; Hall sitting in the chair in the booking area; and Hall's activities in Cell 157A.  [Record No. 89]

Hanshaw relayed his observations by phone to Lieutenant Gustavo Guzman, who told him to have a deputy take Hall's vital signs.

Hanshaw instructed Deputy Miller to take Hall's vital signs. Miller did so and Hanshaw called Guzman, who was already en route to the jail by that time. Guzman went to Cell 157A and observed Hall upon his arrival. He immediately instructed Deputy Thomas Meaux to call for an ambulance because Hall was not speaking. An ambulance arrived at 7:55 a.m., at which time Hall's temperature was 103.2 degrees. He was taken to King's Daughters Medical Center in Ashland, Kentucky, and subsequently was transferred to the University of Kentucky Medical Center where he died on January 12, 2019. The official cause of death was encephalopathy secondary to tricuspid and aortic valve endocarditis due to chronic IV illicit drug use. [Record No. 88-42]

The plaintiffs have tendered the deposition testimony of Casey Crum and Paul Crisp, who were inmates housed in Cell K with Hall from January 3 through January 6, 2019. [Record Nos. 99, 98] Both men testified that Hall was ill during this time period. Crisp stated that Hall looked like he had "a bad case of the flu or worse," but Crisp assumed Hall was detoxing because he knew that Hall used drugs. [Record No. 98, p. 74] Crisp indicated that Hall got in line twice per day, every day, during med pass and asked the nurse for help. *Id.* at 21. Crisp remembered Hall's condition deteriorating and stated that, by the end of his time in Cell K, he mostly just laid on his mat. *Id.* at 36. Crisp acknowledged that there were "occasions where [the nurses] would give an inmate what they needed at the door when they asked for it, whether they put in a request or not." *Id.* at 64. Crisp did not speak with Hensley, Guzman, or Hanshaw about Hall's condition. *Id.* at 68-69.

Crum recalled things somewhat differently. He stated that Hall was feverish and "delirious." [Record No. 99 at p. 31] According to Crum, Hall could not walk and just laid there when the nurses came for med pass. Crum stated that the other inmates asked the nurses to help Hall but they responded that he would have to file a request for sick call. He also testified that the kiosk was not working much of the time and that Hall would not have been able to use it anyway due to his condition. When confronted with medical records indicating that Hall was seen by nursing staff during that period, Crum admitted that there may have been things he missed while he was sleeping. *Id.* at 61, 66. Crum had no specific recollection of speaking to Hensley, Guzman, or Hanshaw about Hall. *Id.* at 68-69.

The plaintiffs also have tendered the deposition testimony of Jon Russell, M.D., an emergency medicine physician. [Record No. 101] Russell provides relevant information concerning the medical diagnoses at issue in this case. Russell testified that sepsis is an "entire constellation of symptoms" that is usually indicative of "overwhelming infection. *Id.* p. 8. Having at least two of the following four symptoms is the threshold for being suspicious of sepsis: a probable or confirmed infection; fever above 101 degrees; a heart rate higher than 90 beats per minute; and a breathing rate higher than 20 breaths per minute. Changes in blood pressure also can be a symptoms of sepsis. *Id.* Sepsis can develop in a couple of days or at little as one hour. *Id.* at 36-37.

Endocarditis, an infection of the heart valves, is common in patients who have a history of intravenous drug use. Symptoms include fever, shortness of breath, anxiety, chest pain, heart murmur, and an overall feeling of unease. *Id.* at 9-10. The only way to definitively diagnose endocarditis is through an echocardiogram. *Id.* at 10. Endocarditis and sepsis are

- 7 -

treated with aggressive antibiotics. According to Russell, "encephalopathy is just a fancy term for confusion or altered mental status." *Id.* at 30.

Russell also explained the symptoms of heroin and methamphetamine withdrawal. They include nausea, agitation, body aches, headaches, increased blood pressure, and sweating. *Id.* at 12. Typically days three through five of the withdrawal period are the most intense, but patients usually experience symptoms for "a couple of weeks." Most patients seen for withdrawal symptoms are treated for nausea and given a referral to a detox facility. *Id.*

Courtney Stewart, as Administratrix of Hall's Estate, and as next friend of Hall's minor child L.H., filed a Complaint in the Boyd County Circuit Court on December 31, 2019, alleging claims of negligence, negligent infliction of emotional distress, loss of consortium, and deliberate indifference to serious medical needs under 42 U.S.C. § 1983 against Hensley, Hanshaw, Guzman, Miller, BCDC, Voss, Yeargin, Patrick, and ACH, in their official and individual capacities. The defendants removed the matter to this Court on January 27, 2020, based on the Court's federal jurisdiction over the § 1983 claims and supplemental jurisdiction over the related state-law claims.

The defendants have filed several motions for summary judgment. In addition, the ACH Defendants and the BCDC Defendants have each filed a motion to exclude certain opinions and testimony of the plaintiff's proposed corrections expert, Patrick Hurley.

## II.    Motions to Exclude Opinions and Testimony of Patrick Hurley

Patrick Hurley owns and operates Hurley Consulting, LLC in Williamsport, Ohio. [Record No. 103-5] He describes himself as a corrections professional, use of force consultant, security administrator, trainer, leader/team builder, negotiator, and project manager. He holds a bachelor's degree in sociology and a master's in business administration. Hurley began

working as a case manager for the Ohio Department of Rehabilitation and Corrections in 1983 and became a deputy warden in 1988.  From June 2000 to December 2005, he continued working for the Department as a warden.  After retiring, Hurley began consulting with jails regarding security issues, including proper use of force.  He has been retained as an expert witness in numerous civil cases in various jurisdictions throughout the United States.  Hurley provided a written report on behalf of the plaintiff in this matter.  The defendants have filed motions to exclude portions of Hurley's opinions and testimony.

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify" if the witness's testimony is "based upon sufficient facts or data, … is the product of reliable principles and methods, and the witness has applied the principles and methods reliable to the facts of the case."  The rule imposes a "gatekeeping" duty on district courts, which requires courts to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  The party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to [specialized] knowledge that will assist the trier of fact in understanding and disposing of relevant issues."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

The ACH Defendants argue that Hurley is not qualified to offer opinions regarding their medical decisions.  The plaintiff acknowledges that Hurley is not familiar with the

standard of medical care for inmates and contends that he would only testify regarding the ACH defendants' "administrative protocols, or lack thereof."

Notwithstanding the plaintiff's characterization of Hurley's opinions, a review of his report and deposition testimony reveals that he does, in fact, criticize the ACH defendants' medical decisions and the care they provided to inmates. For example, Hurley criticizes LPN Yeargin for her alleged failure to follow up on Hall's sores when she saw him on January 5, 2019. He also alleges that LPN Patrick inappropriately failed to communicate with the jail staff on January 6 that Hall should have been placed under observation. Hurley further argues that Dr. Everson or some corporate representative of ACH had a duty to develop policies, procedures, and protocols for handling specific diagnoses, debriefing during staff changes, and specifically looking for signs of sepsis in inmates.

The plaintiff has failed to demonstrate by a preponderance of the evidence that Hurley is qualified to offer these opinions. He has no medical education or training besides basic CPR and first aid. He reports that in several of his roles, he was "responsible for the oversight and supervision of medical and mental health services at the prison." [Record No. 39-1, p. 2] While this did not include determining medical or treatment options for inmates, it included "ensuring compliance with state and national standards or legal requirements related to these services." *Id.* As a proposed corrections expert, Hurley may be able to testify regarding his experience with correctional policies, protocol, and training that overlap to some extent with medical issues, but he may not offer opinions on specific medical care. *See Davis ex rel. Estate of Price v. Roane Cnty., Tenn.*, 2015 WL 6738174, at *9 (E.D. Tenn. Nov. 4, 2015). Each of the opinions identified in the ACH Defendants' motion constitutes an impermissible medical opinion.

The BCDC Defendants identify the following opinions they contend should be excluded:

a.    Any opinion that characterizes Hall's temperature as a fever.  Hurley's initial report states that Hall correctly believed that he had a fever when his temperature was reported as 99.9 on January 3, 2019.

b.    "[Hall's] vital signs were obtained, and no abnormalities were found, but this assessment does not appear to be supported by the vital signs recorded on the Medical Progress Notes."

c.    "Mr. Hall had access to care, but that care did not address his serious medical conditions and did not provide observation or follow-up."

d.    Any opinion that Hall "had … signs of infections" or that Hall's symptoms "are consistent with risk factors for the onset of sepsis."

e.    Any testimony to the effect that Hall's "medical condition had deteriorated to the point that his death was imminent" by any particular time.

f.    "Mr. Hall had conditions and factors which placed him at risk for medical emergency" or similar opinions that Hall had a "medical emergency"

g.    "[T]he staff failed to recognize signs of medical duress and his need for emergency care, even after a nurse documented that he appeared to be having a hard withdrawal. … The medical staff failed to recognize symptoms of a medical emergency and/or did not fully communicate his conditions to the physician when telephone orders were discussed. They did not ensure that any follow up was conducted regarding his withdrawal or complaints about a fever; the follow up was initiated by Mr. Hall."

- 11 -

h.    "Mr. Hall had several of the symptoms of sepsis and several of the risk factors. He had a temperature of 99.0, a pulse of 99, an infection with sores all over. His risk factors were a compromised immune system from Hepatitis C, a Heroin addiction, high blood pressure and withdrawal at the time he was received at the jail. On 1/3/99 he had a temperature of 99.9 and a pulse of 102. His temperature and pulse were either on the borderline of elevated readings for these markers or just above those markers."

i.    Any characterization of sepsis as "lethal."

j.    "The medical literature is clear that the proper identification of sepsis requires testing."

k.    "Physicians need to see these type of patients personally and to have protocols to trigger their notification when an inmate's condition deteriorates. . . .  When telephone medicine is practiced, nurses or medical staff are expected to convey complete information to the provider and the provider is expected to ask probing questions to ensure that the provider can make an informed decision. The quality of diagnosis during a telephone assessment is only as good as the informed [sic] provided or solicited. When there is a question about the seriousness of the inmate's condition and the provider is not on site, then the provider should either come to the facility to make an assessment or refer the inmate to the local hospital for emergency care."

l.    "Mr. Hall's condition met these guidelines," referring to guidelines contained in unidentified "professional [medical] literature."

m.    "Infection is one of the symptoms of sepsis and should be treated as a medical emergency according to several sources found in medical literature. This information was provided in the original opinion [citing sources]."

n.    "Mr. Hall had symptoms of a possible life-threatening infection the day he was initially seen by medical staff at the [BCDC]."

o.    "[Hall] may not have known the cause of his symptoms and may not have met the technical limits for certain vital sign triggers of concern, but he was near those borderlines and was voicing the symptoms consistent with sepsis information."

p.    "Despite having some of the symptoms and risk factors, Mr. Hall was never assessed for this emergency medical condition until he was so severe that it was too late to save him."

q.    "It is reasonable to expect providers to conduct thorough assessments of inmates with illnesses and risk factors. Those expectations included sufficient documentation or charting to establish the basis of the care and verification of follow up or monitoring. These expectations also include that the providers would be current in their training and understanding of the unique medical risks associated with an inmate population. … [P]roviders should intentionally look for this condition during the intake process in the same manner as the assessment for other serious health conditions. For inmates with risk factors and an infection, the expectation should be that measures are taken to 'rule out' a sepsis infection."

As previously stated, Hurley has no medical training or education and is unqualified to opine on these topics.  The plaintiff attempts to dodge the defendants' argument by arguing, inexplicably, that the alleged lack of documentation regarding the treatment of Hall's sores "goes to an administrative issue with the detention center and its agent, ACH, in terms of keeping the necessary documentation."  [Record No. 108, p. 3]  While this is no doubt an attempt to smuggle in an impermissible medical opinion, the plaintiff also has failed to show that Hurley is qualified to testify regarding the adequacy of ACH's documentation.  Hurley

has no training or experience to testify what a nurse or any other medical professional is required to document as part of his or her practice. Hurley is likewise unqualified to testify regarding the signs and symptoms of sepsis. Contrary to the plaintiff's assertion, Hurley is not entitled to rely on medical articles and journals in forming an expert opinion because these are not the types of materials reasonably relied upon by corrections professionals in forming opinions in their area of expertise. *See Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 717 (6th Cir. 1999) (citing Fed. R. Evid. 703).

Finally, the plaintiff contends that Hurley should be able testify that Hall "obviously" had a medical emergency that "should have been patently obvious to the Boyd County Defendants" and that he should be permitted to "reiterate" findings in the medical records. Again, Hurley is not qualified to determine what constitutes a medical emergency or provide an opinion regarding medical findings.

Based on the foregoing, the defendants' motions to exclude the identified portions of Hurley's opinions and testimony will be granted.

### III.    Motions for Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient

- 14 -

evidence from which the jury could render a verdict in its favor.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## A.    Deliberate Indifference to Serious Medical Needs—42 U.S.C. § 1983

To prevail under 42 U.S.C. § 1983, the plaintiff must show that Hall was deprived of a right secured by the Constitution or laws of the United States and the deprivation was caused by a person acting under color of state law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010).  Private corporations performing traditional state functions such as the provision of medical services to inmates act under color of law for purposes of § 1983.  *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015).

States have an obligation to provide adequate medical care for individuals they incarcerate.  *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  For convicted prisoners, this right springs from the Eighth Amendment's protection from cruel and unusual punishment. The Fourteenth Amendment's due process clause grants analogous rights to pretrial detainees. *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016).  To succeed on a claim of deliberate indifference to a pretrial detainee's serious medical needs, a plaintiff must show: (1) the detainee had an objectively serious medical need; (2) a reasonable officer at the scene

- 15 -

(knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk. *Trozzi v. Lake Cnty., Ohio*, To , 757-58 (6th Cir. 2022). "In practice, that may mean that a prison official who lacks awareness of the risks of [his] inaction . . . cannot have violated the detainee's constitutional rights." *Id.* at 758.

The parties do not dispute that Hall had a serious medical need. Accordingly, the Court considers the claims against each defendant individually with respect to the second and third factors.

### 1. Hensley

The plaintiff argues that Hensley violated Hall's constitutional rights because he made no effort to check on Hall and "simply left it to the medical personnel," who he knew were not "doing their job." It is undisputed that Hensley only encountered Hall once. Hensley was working at around midnight on the morning of January 7, 2019, when he heard laughter coming from the medical observation cell, which was a couple of doors down from his office. [Record No. 91, p. 5] When he went to investigate, he found that two deputies were laughing because an inmate trustee was dry heaving while cleaning up feces in the cell. When Hensley asked what had happened, the deputies advised him that Hall was sick and had gone to see medical staff, who had asked for him to be kept in that cell so that staff could "keep an eye on him." Hall had experienced "pretty heavy diarrhea," so a deputy took him to a bathroom in the booking area to shower.

Hensley testified that a "male nurse" was present at the time and advised that he was going to keep an eye on Hall and "had it under control." Hensley returned to his office and

decided to go home at around 2:00 a.m.  When he exited through the booking area, he saw Hall sitting in a chair after having taken a shower and received fresh clothing.  Hensley testified that he asked Hall if he was alright and Hall responded, "yes."  Although Hensley thought that Hall looked like he was not feeling well, he was sitting upright and did not appear to be in any state of medical emergency.

Given these facts, a reasonable officer in Hensley's position (without the benefit of hindsight) would not have known that Hall was suffering from a serious medical condition requiring immediate assistance.  *See Trozzi*, 29 F.4th at 758.  Hensley knew that Hall had diarrhea, which on its own would not require emergency medical care.  Hensley also observed Hall sitting upright and had a brief exchange with him.  In short, there is nothing to suggest that a reasonable official in Hensley's position would have known that Hall's condition was actually more serious.

The plaintiff also faults Hensley generally for leaving Hall's health care to ACH when he knew that it was not fulfilling its obligations under the parties' contract.  Hensley testified that, at the time of Hall's incarceration, ACH was not meeting its obligation to provide onsite nursing services 16 hours per day, seven days per week.  However, the plaintiff has not identified any evidence indicating that there was a nursing shortage during the specific period that Hall was incarcerated or that a lack of staffing led to Hall's harm.  Regardless, with respect to the claim against Hensley in his individual capacity, the analysis does not change because Hensley had no reason to believe that Hall's medical needs subjected him to an excessive risk of harm.

### 2.    Guzman and Hanshaw

Guzman was a lieutenant at BCDC at the time of Hall's incarceration.  [Record No. 93, p. 5]  Guzman's first memory of Hall is when Sergeant Hanshaw called him the morning of January 7, 2019, to say that Hall may be ill.  *Id.* at 15.  Guzman, who was already on his way to the jail, told Hanshaw to "get his vitals and call [him] back."  Deputy Joshua Miller took Hall's vital signs and wrote them on a piece of paper.  Hanshaw showed the paper to Guzman when he arrived and Guzman went in to speak to Hall.  Guzman testified that Hall "appeared normal," but only shook his head and mumbled in response to Guzman's questions.  *Id.* at 17.  Guzman immediately directed another deputy to call for an ambulance.

The plaintiff disputes that this incident was Guzman's first encounter with Hall.  Paul Crisp testified that while he never talked with Guzman about Hall's condition, another inmate, who he could not identify, told Guzman on one occasion that Hall was sick.  [Record No. 98, pp. 68-69]  Accepting this testimony as true, merely telling Guzman that Hall was "sick" did not put him on notice that Hall was subject to an excessive risk of harm.  When Guzman received Hanshaw's call alerting him that Hall may be seriously ill, he directed Hanshaw to obtain vital signs, as he was already en route to the jail.

There are no facts in the record to indicate that Guzman had reason to understand the seriousness of Hall's condition prior to seeing him the morning of January 7.  Further, he did not ignore Hall's condition, but responded, first by instructing Miller to "get his vitals."  Guzman testified at his deposition that he believed a nurse from ACH would have been at BCDC by the time Hanshaw made the phone call, so it is unclear who he believed would be checking Hall's vital signs.  [Record No. 93, p. 16]  But even if Guzman believed a deputy would be performing this task, it does not amount to deliberate indifference to Hall's medical

- 18 -

needs.  Guzman knew he would be arriving at the jail promptly, where he could personally assess Hall, which he did.  Guzman immediately summoned emergency help upon realizing the potential seriousness of Hall's condition.  His actions simply do not constitute deliberate indifference to Hall's serious medical needs.

Deputy Travis Hanshaw first came into contact with Hall when Hall was booked into custody on December 30, 2018.  [Record No. 96, p. 6]  Hanshaw, who was familiar with Hall, spoke with him briefly, and Hanshaw did not notice Hall showing any signs of illness.

Hanshaw did not recall whether he saw Hall again prior to January 7, 2019.  Crisp testified in his deposition that Hanshaw came by Cell K at times and "everybody in there would be saying 'Hey, he's sick… He needs medical attention."  Casey Crum testified that Hanshaw was "pretty good" about performing cell checks and would "come in quietly and walk around and just make sure everything was kosher."  [Record No. 99, p. 22]  Crisp conceded that he may have missed some things that happened while he was asleep, but maintained that Hanshaw knew that Hall was sick.  [Record No. 98, p. 69]

Hanshaw went to Hall's cell around an hour after a deputy informed him that Hall "was not acting right" on the morning of January 7.  [Record No. 96, p. 8]  While Hanshaw knew that "something was wrong," Hall was able to answer Hanshaw's questions by shaking his head and video evidence confirms that Hall was able to stand when Hanshaw asked him to do so.  Even if Hall's condition was objectively serious at that time, Hanshaw reasonably responded by calling his supervisor to report Hall's condition.  *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (defining an objectively serious condition as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even

a lay person would easily recognize the need for a doctor's attention). When Guzman said he was "about to pull in," Hanshaw waited for Guzman to come inside and assess Hall for himself.

Based on the foregoing, there is insufficient evidence for a jury to conclude that Hanshaw was deliberately indifferent to Hall's serious medical needs. A deputy's report that Hall was not "acting right" did not put Hanshaw on notice of a serious medical need; Dr. Russell testified that agitation is a common symptom of drug withdrawal. Further, BCDC staff were aware that med pass occurred twice per day and that nursing staff would be observing inmates, at least cursorily, at those times. And while Crisp contends that Hanshaw was "well aware that [Hall] was sick," there is nothing to suggest that Hanshaw had reason to believe he needed to intervene to prevent serious harm to Hall. Hanshaw's failure to second-guess the medical providers' decisions and call for an ambulance prior to the incident on January 7 simply does not approach the level of conduct that constitutes deliberate indifference to an inmate's serious medical needs.

Further, the plaintiff has failed to offer sufficient proof that the BCDC Defendants' actions or failures to act were the proximate cause of Hall's harm. When bringing a claim under § 1983, the plaintiff must provide proof of a causal connection between a defendant's unconstitutional action and the plaintiff's injury. *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 490 (6th Cir. 2020). Nursing staff assessed Hall routinely throughout the relevant period and reported their findings back to Dr. Everson, who made the decision to continue to treat Hall for withdrawal symptoms. There is nothing to indicate the result would have been any different had any of the BCDC Defendants taken Hall to the medical office within that same time frame.

- 20 -

With respect to the morning of January 7, the plaintiff has not provided any proof, expert or otherwise, to show that the outcome would have been different if Hall had gone to the hospital earlier. Accordingly, the BCDC Defendants are entitled to summary judgment on the §1983 claims.

### 3.    Official Capacity Claims Against BCDC Defendants [4]

Stewart contends that Hensley is liable for deliberate indifference in his official capacity based on his failure to implement policies regarding BCDC guards' responsibilities with respect to medical care and cell checks. [Record No. 103, p. 17] A claim against a government officer in his official capacity is tantamount to a claim against the governmental agency that employs the officer, in this case Boyd County. *McCrystal v. Ky. State Police*, 2008 WL 4975109, at *4 (E.D. Ky. Nov. 20, 2008) (citing *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 n.2 (1997)).

The plaintiff must prove that his "constitutional rights were violated and that a policy or custom of the municipality was the moving force behind the deprivation of the plaintiff's rights" to succeed on a § 1983 brought against a municipality. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). A plaintiff may demonstrate liability under the following methods: the existence of an illegal official policy or legislative enactment; that an official with final decision making authority ratified illegal actions; the existence of a policy of inadequate training or supervision; or the existence of a custom of tolerance or acquiescence

---

[4]    The Complaint names all BCDC Defendants in their official capacities and the BCDC Defendants have moved for summary judgment on all claims. While the defendant's response only makes reference to the official-capacity claim against Hensley, the analysis is the same for all BCDC Defendants.

of federal rights violations. *Jackson v. City of Cleveland*, 925 F.3d 793, 803 (6th Cir. 2019), cert. denied 140 S. Ct. 855 (Jan. 13, 2020).

The plaintiff does not discuss *Monell* or identify which method should apply here. Nevertheless, other district courts within the Sixth Circuit have properly analyzed allegations concerning the failure to implement a policy under a failure to train theory. *See Grove v. Metro. Gov't of Nashville & Davidson Cnty.*, 2019 WL 2269884, at *2 (M.D. Tenn. May 28, 2019) (citing *City of Canton v. Harris*, 389 U.S. 378, 388-89 (1989)). To show that a municipality is liable for a failure to train its employees, a plaintiff must show that the municipality's training program was inadequate for the tasks the officers must perform; the inadequacy was a result of the municipality's deliberate indifference; and the inadequacy was closely related to or actually caused the injury. *Jackson*, 925 F.3d at 834.

The first prong has been satisfied, as there was no training program in place at the time of the events in question. However, the plaintiff cannot show that the training inadequacy is closely related to or actually caused Hall's injury. To do so, she would have to "prove that the deficiency in training actually caused [a defendant's] indifference to [Hall's] medical needs." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989). As previously explained, she has not identified an individual BCDC defendant that was deliberately indifferent to Hall's serious medical needs. Further, a municipality does not demonstrate deliberate indifference by failing to provide medical training in addition to first aid and CPR, particularly where medical providers are on site part-time and on call 24 hours per day, seven days per week. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018).

Stewart has made no attempt to explain how the facts of this case satisfy any legal test under *Monell*. Instead, she points to testimony regarding general overcrowding at the jail and

remedial measures the county allegedly made following Hall's death. She also refers the Court generally to a January 10, 2019, Department of Corrections inspection report detailing "over 50 violations," ranging from cell checks not being documented to the lack of an updated policies and procedures manual. But Stewart fails to connect these alleged inadequacies to Hall's death. Accordingly, the BCDC Defendants are entitled to summary judgment regarding the official-capacity deliberate indifference claims.

### 4.    LPN Voss

Stewart contends that Voss was deliberately indifferent to Hall's serious medical needs because she "did very little with [the] information" she obtained during Hall's initial assessment on December 30, 2019. [Record No. 105, p. 16] Stewart claims that Voss's notes were "never communicated to anyone else at ACH." She also criticizes Voss's initiation of a Detox Flow Sheet that was not completed.

Voss worked at BCDC on an as-needed basis and only saw Hall for his initial assessment. Voss documented that Hall had previously taken Clonidine but had "no current meds," had a history of IV drug use, had hepatitis C, and had sores on his body. [Record No. 9] She also reported that he had used heroin and methamphetamine the day prior. Voss documented his vital signs, which were within normal limits. Dr. Russell testified in his deposition that Voss properly recognized Hall as a "high risk person" and initiated a detox protocol to monitor his vital signs. [Record No. 101, p. 15] According to Russell, Voss "did nothing wrong."

There is no evidence to suggest that Voss had reason to know that Hall had a serious medical need at this time. Based on her initiation of the detox flow sheet, she clearly recognized that he might experience withdrawal symptoms and would need to be monitored.

- 23 -

Per Dr. Russell's testimony, Hall did not exhibit any of the symptoms of sepsis at time of booking, save a mildly elevated blood pressure, which Hall indicated was normal for him. [Record No. 88-9] There is simply nothing to suggest that Voss knew or should have known that Hall had a serious medical condition or that she should have reacted differently to avoid an excessive risk of harm to him.

### 5.    LPN Patrick

Stewart claims that Patrick was deliberately indifferent to Hall's serious medical needs based on his alleged decision to deny treatment to Hall and to "tune out the chorus of warnings and complaints from other inmates that [Hall] was seriously ill." [Record No. 104, p. 16] Stewart relies largely on the deposition testimony of Hall's cellmates, Crisp and Crum, who contend that "the male nurse" ignored Hall's and the other inmates' pleas for help. The plaintiff stresses that Hall did not leave the cell between January 3 and January 6 and received, at most, cursory evaluations at the cell door.

Crisp and Crum's testimony does not raise a question of deliberate indifference for several reasons. Although the plaintiff asserts that Patrick ignored Hall's pleas for help, these witnesses admit that Patrick may have assessed Hall in or near the cell. Crisp testified that Hall was at the cell door "every day, twice a day," talking to a nurse about his medical issues. [Record No. 98, p. 30] Although Patrick did not recall his specific encounters with Hall, it is uncontested that ACH nurses consulted with prisoners at their cells during med pass. [*See* Record No. 99, p. 64.] Even Crisp testified that he had staples removed from his head outside his cell door. [Record No. 98, 72] Additionally, both men acknowledged that they could have been sleeping when Hall received medical attention. [Record No. 99, p. 65; 98, p. 94]

The Court also notes that Hall's vital signs were within normal limits when Patrick saw him on January 3 and 5, 2019. Even so, Hall called Dr. Everson to develop a plan of care to treat Hall's symptoms, which were believed to be those of withdrawal. And when Hall was taken to medical on the night of January 6, his vital signs were normal, with the exception of his blood pressure, which was slightly elevated. He still did not have two symptoms which Russell stated would be the threshold of suspicion for sepsis. Hall had last used drugs on December 29, 2018, so he would have been well within the withdrawal period as defined by Russell. [*See* Record No. 101, p. 12.] Stewart identifies no facts that would have alerted Patrick to a diagnosis of sepsis or endocarditis or otherwise would have led him to believe that the diagnosis of withdrawal was incorrect. *See Winkler*, 893 F.3d at 892.

Patrick contacted Dr. Everson again on the night of January 6, who prescribed medications to treat withdrawal symptoms. Patrick then oversaw Hall's transfer to the medical observation area. Patrick normally worked 8:00 p.m. until 4:30 a.m. [Record No. 92, p. 11] However, he left at around 2:00 a.m. on November 7, 2019, because he had to report back to work later that morning. *Id.* at 28. The plaintiff undoubtedly criticizes Patrick's decision to leave Hall under the observation of the medically untrained jail staff. But Patrick did not callously ignore Hall's serious medical needs. Although Patrick had grown more concerned about Hall's condition, he (along with Dr. Everson) still reasonably believed that Hall was withdrawing from drugs. Patrick left Hall in the medical observation area so that he could be closely monitored by jail personnel. Accordingly, he did not disregard Hall's symptoms such that he knew his actions posed a serious risk of harm to Hall.

### 6.      LPN Yeargin

Stewart contends that Yeargin was deliberately indifferent to Hall's medical needs because she refused to take action while Hall was in Cell K.   [Record No. 102, p. 13]  Specifically, she argues that Yeargin ignored Hall's condition and stated that he should file a sick-call request, even though he was very ill and the kiosk was nonfunctioning much of the time.   Stewart maintains that Yeargin "had numerous encounters with [Hall] every time she came through the jail" performing med pass.  *Id.* at 15.

These arguments are supported by the testimony of Crisp and Crum, which Stewart describes as "specific, detailed, and not contradicted."  But neither of these witnesses identified Yeargin as a nurse that performed med pass during the relevant time period.  Crisp identified a nurse named "Christy" and possibly Patrick, as he believed Patrick was the only male nurse. Crisp was unfamiliar with the name "Susan Yeargin."  He testified that, "[e]ach med pass, it would be one nurse, but it would be a different nurse.  Different shift, different days."  [Record No. 114-6, p. 88]  Yeargin has tendered a copy of her "timecard" indicating that she did not work on January 2, 3, or 4.  [Record No. 113-1]

To meet the subjective component of the deliberate indifference test, the plaintiff must show a sufficiently culpable mental state on the part of each individual defendant.  *Trozzi*, 29 F.4th at 758.  But Stewart has failed to establish that Yeargin had any contact with Hall aside from the January 5 encounter in which Hall requested blood pressure medication.  She documented his vital signs and communicated with Dr. Everson, who prescribed blood pressure medication.  A defendant's failure to provide better or different care, particularly in the absence of a known risk of serious consequences, does not constitute deliberate indifference.  *See Britt v. Hamilton Cnty.*, 531 F. Supp.3d 1309 (S.D. Ohio 2021) (nurses

performing withdrawal assessments did not exhibit deliberate indifference to detainee's serious medical need).

### 7.    *Monell* Liability—ACH

Stewart fails to state a claim for *Monell* liability against ACH.  In response to ACH's motion for summary judgment, the plaintiff simply reiterates her allegations concerning the individual ACH defendants.  But employers are not vicariously liable for the conduct of their employees under *Monell*.  *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir.), *cert. denied*, 574 U.S. 1047 (2014).  Instead, the relevant question is whether the challenged conduct occurred pursuant to ACH's policy or custom.  *Id.*

The plaintiff has not attempted to develop an argument showing that ACH maintained such a policy or custom or that it was the cause of Hall's injuries.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Accordingly, ACH is entitled to summary judgment with respect to this claim.

### B.    State Law—Negligence

### 1.    BCDC Defendants

The plaintiff alleges that Defendants Hensley, Guzman, and Hanshaw breached their duties to provide medical care and to protect Hall from injury consistent with standard correctional practice.  The defendants contend that they are entitled to qualified immunity, which applies to the negligent performance by a public officer or employee of: (1) discretionary acts or functions; (2) in good faith; and (3) within the scope of the employee's

authority.[5] *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Once the defendant has demonstrated that the act was performed within the scope of his or her discretionary authority, the burden shifts to the plaintiff to establish that the discretionary act was not performed in good faith. *Id.* (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

The Court examines the acts complained of and classify them as discretionary or ministerial to determine whether the defendants are entitled to qualified official immunity. Discretionary acts are those "involving the exercise or discretion of judgment, or personal deliberation, decision, and judgment." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 477 (Ky. 2006). A ministerial act, on the other hand, is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citing *Yanero*, 65 S.W.3d at 522). "Whether a duty is discretionary or ministerial depends on the facts of the case." *Medley v. Shelby Cnty., Ky.*, 742 F. App'x 958, 961 (6th Cir. 2018) (citing *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 809 n.9 (Ky. 2009)). Few acts are purely discretionary or purely ministerial, so the Court must look for the dominant nature of the act. *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010).

Stewart contends that K.R.S. § 71.040 and 501 K.A.R. 3:090(13) impose ministerial duties on Hensley, Guzman, and Hanshaw that they failed to perform.[6] Section 71.040

---

[5] The plaintiff sued Hensley, Guzman, and Hanshaw in both their individual and official capacities. However, official capacity state-law claims against county jail officials are barred by sovereign immunity. *See Com. v. Harris*, 59 S.W.3d 896, 899 (Ky. 2001).

[6] The plaintiff cites § 3:090(12), but discusses the text of § 3:090(13). Subsection 12 requires jails to have written policies with respect to suicidal detainees and does not appear to have any relevance to this case.

provides for the treatment of prisoners and disposition of deceased prisoners.  It reads, in relevant part:

> At the time of booking, the jailer shall receive and keep in the jail all persons who are lawfully committed thereto, until they are lawfully discharged, unless the person is in need of emergency medical attention, in which case the arresting officer shall obtain medical attention for the person prior to delivery to the jail. The jailer shall treat them humanely and furnish them with proper food and lodging during their confinement.

Section 3:090 is the administrative regulation relating to medical services at Kentucky Department of Corrections facilities.  Subsection 13 of that provision states that "[e]mergency medical, vision, and dental care shall be available to all prisoners commensurate with the level of care available to the community."  Subsection 21, which states, "[i]if emergency care is needed, it shall be provided," also is applicable.

Despite the general provisions concerning inmates' rights to emergency medical care, the plaintiff does not identify any "specific, concrete rule" that any of the defendants violated. *See Medley*, 742 F. App'x at 961.  Instead, Stewart's claims are based on alleged lapses in judgment—that the defendants should have recognized the seriousness of Hall's condition, possibly second-guessed the medical staff's decisions, and taken further actions.  These duties involved a significant exercise of discretion and personal deliberation and, therefore, were discretionary in nature.

Hensley's failure to adopt relevant policies or procedures is a discretionary action, as well.  Section 501 K.A.R. § 3:020(3) requires Kentucky jailers to develop a written policy and procedures manual that addresses a broad range of topics, including medical services.  Although jailers are required to develop policy and procedure manuals, there do not appear to be any specific requirements for provision of emergency medical services beyond the generic

requirements of 501 K.A.R. 3:090. *See Pelfrey v. Hughes*, 2022 WL 15526542, at *3 (Ky. Ct. App. Oct. 28, 2022) (quoting *Yanero*, 65 S.W.3d at 529) (observing that "rule-making is an inherently discretionary function."). Accordingly, there is a great deal of discretion and personal deliberation with respect to the precise procedures that are adopted.

The plaintiff has not attempted to demonstrate that any of the defendants acted with a lack of good faith, which can be proved in two ways: (1) that the public official violated a clearly established constitutional, statutory, or other right of the plaintiff; or (2) that the public official acted willfully, maliciously, or with a corrupt motive to cause harm to the plaintiff. *Yanero*, 65 S.W.3d 510. Stewart has failed to raise a genuine issue of material fact indicating that the defendants were deliberately indifferent to Hall's serious medical needs, as the Court has explained previously. And there is no evidence to suggest that the defendants acted maliciously or with a corrupt motive to cause harm to Hall. While inmates Crisp and Crum testified that officers ignored Hall's condition during the period of January 3 through 6, 2019, the defendants reasonably relied on the ACH Defendants to care for Hall's medical needs, to the extent they were aware of them.

The Court makes an additional observation with respect to Hensley's failure to implement a written policy at the time of Hall's incarceration. Hensley had only been on the job for three weeks and by all accounts was working diligently to remedy the many preexisting issues that needed attention at the jail. Accordingly, there is no lack of good faith with respect to the plaintiff's negligence claim.[7]

---

[7]    These defendants would be entitled to summary judgment even if they were not shielded by qualified immunity because, as previously noted, the plaintiff has not identified evidence of causation.

## 2.    ACH Defendants

Medical negligence requires proof of the following elements: (1) a duty of care; (2) a breach of that duty; (3) actual injury; and (4) that the injury was proximately caused by the negligence. *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 687-88 (Ky. 2003). Plaintiffs alleging medical malpractice are generally required to put forth expert testimony to show that the defendant medical provider failed to conform to the standard of care. *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010).

### a.    LPN Voss

Physicians may testify regarding the standard of care that applies to nursing. *Hamilton v. Pike Cnty.*, 2012 WL 6570508, at *2 (E.D. Ky. Dec. 17, 2012) (citing *Tapp v. Owensboro Med. Health Sys., Inc.*, 282 S.W.3d 336, 340 (Ky. Ct. App. 2009)). The plaintiff's memorandum in opposition to Voss's motion for summary judgment indicates that Dr. Russell, was highly critical of Voss's performance, but does not include any citations to the record. However, Russell, testified as follows:

> Voss did nothing wrong. She was the first one there. She only saw Mr. Hall on the intake. She noted his long history of drug use. She realized he was a high risk person and started the detox flow sheet, which according to protocols, you're supposed to monitor vital signs daily. Again, that was really her only interaction. . . . I could find no fault with her interaction with Mr. Hall.

[Record No. 101, p. 15]

Likewise, the plaintiff's nursing expert, Kaelin Johnson, APRN testified that Voss did not deviate from the accepted standard of care. [Record No. 83-30, p. 15] The plaintiff has not identified any other evidence that would allow her to succeed on this claim.

- 31 -

### b.    Nurse Yeargin

APRN Johnson testified that she could not offer any criticism of LPN Yeargin and could not say that Yeargin deviated from the applicable standard of care. [Record No. 83-30, p. 14] Dr. Russell acknowledged that Yeargin saw Hall just one time, on January 5, 2019, at around 2:00 p.m., when Hall asked to reestablish a prescription for blood pressure medication. [Record No. 101, p. 25] Russell was not critical of Dr. Everson's decision to prescribe Metoprolol for Hall's blood pressure, which was 148/84. The following exchange occurred during Russell's deposition:

> Q: So now my question is, is can we agree that Nurse Yeargin didn't do anything wrong on January the 5th?
> A: Correct. Again, other than lack of documentation of any physical assessment of Mr. Hall.
> Q: Well, to be fair, unlike Nurse Patrick, he's not complaining of anything to her, right?
> A: True.
> Q: He just says, I want my blood pressure medication. She takes his vitals, and she calls the doctor. And the doctor orders the blood pressure medication, right?
> A: Yes.
> Q: So can't we agree that Nurse Yeargin didn't do anything wrong?
> A: Again, I would think there would be a basic assessment somewhere. Somewhere in there. Why do you feel like you need your blood pressure medicine when it's only minimally outside the normal range? Again, she's asking Mr. Hall to be the medical provider, make the decisions, and tell her what's wrong with him. Just like the other visits. They take his word for it that he knows that he's had a fever. . . .
> Q: She takes his vitals, which I assume you would agree is appropriate?
> A: Yes.
> Q: And she passes that information to the M.D., right?
> A: Yes.
> Q: So under that scenario on January the 5th, what did Nurse Yeargin do incorrectly?
> A: Again, I don't know. Because there's no documentation of what else she did, other than just call the doctor. . . .
>
> Q: [A]re you really going to suggest that she deviated from the standard of care by taking vitals and calling her superior?
> A: Well, there's just no assessment for the patient.

*Id.* at pp. 25-26.

Stewart has not identified sufficient evidence from which a jury could conclude that Yeargin was negligent.  Johnson testified that Yeargin did not breach the applicable standard of care and Russell's testimony is, at best, equivocal.  He suggests, but never affirmatively states, that Yeargin should have performed some additional physical examination, but does not explain what the examination should have entailed.

The plaintiff also has failed to identify evidence of causation.  Expert testimony typically is required to prove causation in medical negligence cases.  *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991).  And the testimony must be based on a reasonable medical probability, not mere speculation or possibility.  *Morris v. Boerste*, 641 S.W.3d 688, 698 (Ky. Ct. App. 2022).

The plaintiff contends that "Russell testified that the failures to take action by the medical Defendants caused the endocarditis and eventual death of [Hall] which could have been avoided if a serious and legitimate assessment of his medical condition would have occurred at the time that Hall and the other inmates began complaining about his illness." [Record No. 102, pp. 19-20 (citing Record No. 101, pp. 161-167)] ***This constitutes a blatant misrepresentation of Russell's testimony.***  The Court has identified the following exchange:

> Q:  So based on everything that you've said, are you in a position to suggest, to say within a reasonable degree of medical certainty, that had the folks at ACH done anything different, that the outcome for Mr. Hall would have been different?
> A:  It's tough to say because of the lack of documentation.
> Q:  Agreed.  But as we sit here today, it's fair to say that based on what we have available—depositions, medical records, et cetera, what you and other experts are going to look at in this case, we can agree that you are not in a position to say within a reasonable degree of medical certainty that any actions or inactions

- 33 -

by the folks at ACH led to the death of Mr. Hall? You're not in a position to say yes or no?

A: I can't say—I can't go either direction. Because again, there's a lack of documentation.

[Record No. 101, p. 35]

The plaintiff has failed to present sufficient evidence of a breach of the duty of care or causation. Thus, Yeargin is entitled to summary judgment regarding the negligence claim.

### c.    Nurse Patrick

Similar to Voss and Yeargin, APRN Johnson could not advance any specific criticism against Nurse Patrick. [Record No. 83-30, p. 16] Russell criticized Patrick's documentation and stated, for instance, that Patrick should have explained what he meant by "withdrawing hard." [Record No. 101, p. 28] However, he agreed with Patrick's decisions to contact Dr. Everson and then place Hall in a medical watch cell on the night of January 6.

Stewart contends that Patrick was negligent for failing to evaluate Hall more thoroughly. [Record No. 104, p. 19] This argument is based largely on the testimony of Crisp and Crum, who claim that they, along with Hall, repeatedly asked for medical help for Hall from January 3 through January 6, 2019. Stewart specifically cites Dr. Russell's testimony that these complaints indicate that Hall possibly had sepsis prior to January 6. *Id.* But the plaintiff does not identify (and the Court cannot locate) any testimony from Russell indicating what particular actions any of the ACH Defendants should have taken to differentiate the symptoms of withdrawal from sepsis.

While Russell testified that Hall likely was septic the night of January 6, he acknowledged that Hall's breathing, heart rate, and temperature were normal. While his blood pressure was slightly elevated, this was not unusual for Hall, as he had a preexisting diagnosis

of hypertension.  It was somewhat concerning that Hall's blood pressure had increased despite his resumption of blood pressure medication.  However, Patrick contacted Dr. Everson, informed him of these findings, and followed Dr. Everson's orders.

Russell did not suggest what other measures Patrick should have taken to comply with a purported accepted standard of care.  Russell testified that Hall must have had endocarditis prior to entering the jail, as it takes a minimum of two to four weeks to develop vegetation in two different heart valves, consistent with Hall's eventual diagnosis.  While Russell stated that "listening to the heart is the first thing," he did not indicate that an LPN is expected to detect a heart murmur through auscultation and, in fact, the staff at King's Daughters Hospital did not detect Hall's heart murmur when Hall was transported there.  Further, sepsis can develop in as little as one hour, suggesting that Hall could have become septic after Patrick placed him in the medical observation cell.  *Id.* at pp. 36-37.  Put simply, the plaintiff has not identified a standard of care that Patrick breached or explained how Patrick's actions led to Hall's harm.

### C.    Negligent Infliction of Emotional Distress [8]

The plaintiff's Complaint alleges that all defendants negligently inflicted emotional distress on Hall, Stewart, and Hall's minor child. [Record No. 1-1, p. 16]  A plaintiff asserting a claim of negligent infliction of emotional distress must present evidence of the recognized elements of a negligence claim, as well as "expert medical or scientific proof" of severe or serious emotional injury, i.e., one that a reasonable, normally constituted, person would not be expected to endure.  *Osborne v. Keeney*, 399 S.W.3d 1, 17-18 (Ky. 2012).

---

[8]    Hensley, Guzman, and Hanshaw are entitled to qualified immunity with respect to these claims for the reasons previously stated.

The defendants contend that they are entitled to summary judgment for various reasons, which include the fact that Stewart has failed to tender any evidence of a severe or serious emotional injury. The plaintiff responds summarily, arguing that severe emotional injury is obvious based on the "outrageous nature" of the defendants' alleged acts. Kentucky law is clear that medical or other scientific proof is needed to sustain these claims. The failure to present such evidence is fatal. *See E.M.J. by and through M.J. v. Garrard Cnty. Bd. of Educ.*, 413 F. Supp. 3d 598, 623 (E.D. Ky. 2019). Accordingly, the defendants are entitled to summary judgment.

### D.    Wrongful Death and Loss of Consortium

The Complaint includes counts alleging wrongful death (Count 3) and loss of consortium (Count 6). Since these both of these claims are premised upon the success of the underlying claims addressed herein, the defendants are entitled to summary judgment on these counts. *See* K.R.S. §§ 411.130; 411.145.

### E.    Claims Against Unknown Doctors, Nurses & Medical Care Providers of ACH

The defendants have filed a motion for summary judgment with respect to all claims advanced against unknown ACH Defendants. The plaintiff does not oppose this motion.

### IV.    Conclusion

Based on the foregoing, it is hereby

**ORDERED** as follows:

1.    Defendant Susan Yeargin's motion for summary judgment [Record No. 82] is **GRANTED**.

2.    Defendant Advanced Correctional Healthcare, Inc.'s motion for summary judgment [Record No. 83] is **GRANTED**.

- 36 -

3.      Defendant Devin Patrick's motion for summary judgment [Record No. 84] is **GRANTED**.

4.      Defendant Dawn Voss's motion for summary judgment [Record No. 85] is **GRANTED**.

5.      Defendant Unknown Doctors, Nurses & Medical Care Providers' motion for summary judgment [Record No. 86] is **GRANTED**.

6.      Defendant Advanced Correctional Healthcare, Inc.'s motion to exclude [Record No. 87] is **GRANTED**.

7.      Defendant Gustavo Guzman, Travis Hanshaw, and William Hensley's motion for summary judgment [Record No. 88] is **GRANTED**.

8.      Defendant Gustavo Guzman, Travis Hanshaw, and William Hensley's motion to strike [Record No. 90] is **GRANTED**.

9.      The plaintiff is directed to **SHOW CAUSE** on or before **Friday, February 3, 2023**, why her remaining claims against Defendants Joshua Miller and Unknown Employees and/or Agents of the Boyd County Detention Center should not be dismissed and this matter be dismissed, with prejudice.

Dated: January 13, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky